UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

EBONY GOULD, CURTAYASIA TAYLOR,
SHAVONA WARMINGTON, SHALONDA
CURTIS-HACKETT, CHRISTOPHER
HACKETT, MARIANNA AZAR, MATHEW
ENG, JANE DOE 1, and JANE DOE 2,
individually and on behalf of a class of all others
similarly situated,

                Plaintiffs,

  -against-

THE CITY OF NEW YORK,

                Defendant.

Civil Action No. ___

**CLASS ACTION COMPLAINT
AND JURY DEMAND**

---

**"ACS MADE IT CLEAR—EITHER I LET THEM SEARCH MY HOME OR THEY
WERE TAKING MY KIDS."**

**The New York City Administration for Children's Services Uses Highly Coercive Tactics to
Illegally Search Tens of Thousands of Families' Homes Every Year.**

    Plaintiffs Ebony Gould, Curtayasia Taylor, Shavona Warmington, Shalonda Curtis-

Hackett, Christopher Hackett, Marianna Azar, Mathew Eng, Jane Doe 1, and Jane Doe 2

("Plaintiffs") on behalf of themselves and others similarly situated, by and through their

undersigned attorneys, as and for their complaint, allege as follows:

<u>PRELIMINARY STATEMENT</u>

    1.      One night, without warning, a mother in New York City hears a knock on the door.

Her children are home with her. The family is cooking, or playing, or sleeping.

    2.      When the mother opens the door, two government investigators are standing

outside, loudly demanding to be let inside. She is surprised and confused. She asks what this is

about. The investigators command the mother. *You have to let us in. We need to look in your home.*

*We don't need a warrant. We're going to get the police here if you refuse. We're not leaving until we come inside. If you don't let us in, we're going to take your children.*

3.      The mother has no choice, it seems. Terrified, she reluctantly opens the door and steps aside, and the investigators walk into her home. It is clear that there is no present danger to anyone in the home, but still the investigators search the home top to bottom. They look inside medicine cabinets, under beds, in closets and dresser drawers, in the refrigerator, and in cupboards. The mother does not know why this is happening. The children are scared by these strangers combing through their home.

4.      The investigators demand to see the children's bodies under their clothes. They tell the mother to leave them alone in a room with her children. The investigators command the children. *Lift up your shirt. Pull down your pants. I need to see your chest, your legs, your back.* The children are afraid, but they comply. Their mother cannot protect them from these strangers. The mother fears that if she does not acquiesce to the investigators' demands, they will take her children at any moment. Her fear is reasonable; the investigators are telling her that might happen.

5.      The investigators leave as abruptly as they arrived. They have threatened to return, even though they found no evidence that the children are in danger. There seem to be no rules and no laws to protect the mother and her children from this intrusion.

\*     \*     \*

6.      The City of New York's Administration for Children's Services ("ACS") conducts this kind of invasive and traumatic entry and search inside families' homes more than 50,000 times a year. That means every day well over 100 New York City families experience this harrowing violation.

7.      As part of its routine investigations into families, ACS has a widespread custom, policy, and practice of entering and searching families' homes by using coercive tactics (the "Coercive Tactics") to make parents feel that they have no choice but to allow caseworkers to enter and search their homes. For example, ACS caseworkers lie to parents about their rights, threaten to call the police, and even threaten to take the parents' children away if the caseworkers are not permitted to enter and search the home. ACS conducts the overwhelming majority of these entries and searches without a court order, without voluntary consent, and in the absence of any emergency.

8.      During these searches, ACS routinely rummages through entire homes and conducts untrammeled inspections of families' most private spaces. ACS performs these sprawling searches irrespective of whether these intimate spaces have any connection to whatever allegations have been made about that particular family.

9.      These coerced searches rarely result in determinations that the children require any protection. Less than 7% of investigations lead ACS to file petitions in Family Court alleging that parents committed wrongdoing of any kind.

10.      Nor do these coerced searches enhance child safety. As ACS has acknowledged, data from the first years of the COVID-19 pandemic show that there is no increase in child maltreatment when ACS drastically reduces the number of home entries and searches.

11.      The trauma inflicted by ACS predominantly and disproportionately falls on Black and Hispanic families. More than 80% of the parents and children subjected to ACS investigations are Black or Hispanic. One out of every two Black children in New York City has been subjected to an ACS investigation by the time they reach the age of 18. ACS has acknowledged the racial

impact of its investigations—an ACS-commissioned report describes a "predatory system that specifically targets Black and Brown parents."[1]

12.     ACS's widespread use of the Coercive Tactics to enter and search families' homes violates the Fourth Amendment. There are three ways caseworkers may search a family's home to conduct investigations consistent with the Fourth Amendment: (1) obtain a court order, (2) act upon exigent circumstances that require an immediate search of the home, or (3) obtain voluntary consent. Warrantless home searches like those ACS conducts tens of thousands of times a year are "presumptively unreasonable." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (internal quotation marks omitted).

13.     Under the New York Family Court Act, ACS has the ability "at all hours" to obtain court orders to enter and search families' homes.[2] These orders must be supported by "probable cause" and "specify which action may be taken and by whom."[3]

14.     ACS chooses to almost never seek these court orders. Across the nearly 53,000 investigations ACS conducted last year, it sought only 222 court orders to search families' homes. Even assuming ACS completed only one home search during each investigation (it typically conducts several), ACS sought court orders for just 0.4% of home entries. This means over 99.5% of home searches that ACS conducts are "presumptively unreasonable" under the Fourth Amendment.

---

[1]     Antwuan Wallace *et al.*, New York City Administration for Children's Services Racial Equity Participatory Action Research & System Audit: Findings and Opportunities, National Innovation Service 14 (Dec. 2020) (draft report,) https://int.nyt.com/data/documenttools/draft-report-of-nyc-administration-for-children-s-services-racial-equity-survey/fc3e7ced070e17a4/full.pdf [hereinafter, Racial Equity Report].

[2]     N.Y. Fam. Ct. Act § 1034(2)(f).

[3]     *Id.* §§ 1034(2)(b)(i), (2)(c).

15.     ACS rarely attempts to justify its warrantless home searches by relying on exigent circumstances. Of course, ACS can enter families' homes without a court order or consent when it has grounds to believe a child is in imminent danger. But this case is not about the thankfully infrequent emergencies when warrantless searches are necessary to protect a child's safety. This case is about the overwhelming majority of ACS's more than 50,000 warrantless home searches every year—affecting more than 90,000 children and 70,000 caretakers—where no emergency grounds exist, even assuming the allegations under investigation are true. These allegations are typically non-urgent and frequently involve common occurrences, such as a child missing school without a doctor's note, a child seen playing in a hallway, or a parent disagreeing with a school's recommendation for special education services.

16.     In the absence of exigent circumstances, rather than seeking court orders, ACS caseworkers frequently gain entry into and search families' homes through coercion, untruths, and threats. For instance, ACS caseworkers misrepresent and withhold information from parents about their rights, threaten to involve the police (i.e., government agents with the ability to use force), and even directly threaten to take parents' children away in order to improperly enter and search families' homes. Caseworkers routinely employ these Coercive Tactics multiple times during the same investigation.

17.     ACS's rampant use of the Coercive Tactics to conduct warrantless home searches is well known to Defendant City of New York. These practices have been meticulously documented by ACS's own internal reports, the agency's staff, and the informational materials ACS provides to parents, as well as by academics, reports and testimony of advocates and investigated parents, and in several prior lawsuits.

18.     Nonetheless, ACS fails to provide anything close to adequate training to its caseworkers about families' Fourth Amendment rights during home searches. Instead of ensuring that its staff follows the law, ACS has created and continues to foster a regime of coerced acquiescence by using tactics that inculcate fear in parents that unless they cede to ACS's demands, their children will be taken. Indeed, an ACS internal report describes how the agency creates pernicious incentives for caseworkers to "be invasive and not tell parents their rights."[4]

19.     Plaintiffs are nine parents who were subjected to ACS's Coercive Tactics. These Coercive Tactics misled and intimidated Plaintiffs into believing they had no choice but to permit ACS's warrantless home entries and searches in non-exigent circumstances. ACS deployed an array of Coercive Tactics over the course of the numerous home searches experienced by Plaintiffs: ACS threatened to take Plaintiffs' children away if they did not let ACS into their homes; ACS threatened to call the police if Plaintiffs refused consent to entry; ACS told Plaintiffs the searches were "required" or that ACS "needed" to search their homes; ACS abused and misrepresented its authority; ACS did not meaningfully inform Plaintiffs of their rights to refuse, limit, or revoke consent for ACS's home searches; and ACS made public scenes at Plaintiffs' front doors to intimidate Plaintiffs into letting them in.

20.     Plaintiffs' experiences are not isolated or unusual. They are consistent with and indicative of ACS's widespread and customary practice of deploying highly Coercive Tactics to conduct warrantless searches of families' homes in non-exigent circumstances in violation of the Fourth Amendment.

21.     Plaintiffs, on behalf of themselves and others similarly situated, bring this lawsuit to end these unconstitutional and unconscionable wrongs.

---

[4]    Racial Equity Report, *supra* note 1, at 18.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343(a), as this action seeks redress for the violation of Plaintiffs' constitutional and civil rights.

23.     Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and proper. Rule 65 of the Federal Rules of Civil Procedure authorizes injunctive relief. This Court has authority to award attorney's fees and costs under 42 U.S.C. § 1988.

24.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b) because Defendant City of New York resides in this District and a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of New York.

## JURY DEMAND

25.     Plaintiffs demand trial by jury in this action.

## PARTIES

*Plaintiffs*

26.     Plaintiff Ebony Gould is a resident of Queens, New York. She is the mother of three children: N.G., an eighteen-year-old girl; X.D. a nine-year-old girl; and G.D., a seven-year-old girl (collectively, the "Gould Family"). Ms. Gould is Black.

27.     Plaintiff Curtayasia Taylor is a resident of Bronx, New York. She is the mother of two children: A.C., a twelve-year-old boy; and A.V., a seven-year-old boy (collectively, the "Taylor Family"). Ms. Taylor is Black.

28.     Plaintiff Shavona Warmington is a resident of Queens, New York. She is the mother of six children: L.B., an eleven-year-old girl; P.W., an eight-year-old girl; E.W., a three-year-old girl; N.W.R. and A.W.R, one-year-old twins; and K.W.R., a newborn boy (collectively, the

"Warmington Family"). Ms. Warmington is Black.

29.     Plaintiffs Shalonda Curtis-Hackett and Christopher Hackett are residents of Brooklyn, New York. They are the married parents of three children: C.X.H., a sixteen-year-old boy; S.Y.H., a twelve-year-old girl; and C.Z.H., a nine-year-old boy (collectively, the "Hackett Family"). Ms. Curtis-Hackett and Mr. Hackett are both Black.

30.     Plaintiffs Marianna Azar and Mathew Eng are residents of Brooklyn, New York. They are the married parents of one child: Y.A., a six-year-old girl (collectively, the "Azar-Eng Family"). Ms. Azar is white and Mr. Eng is Chinese-American.

31.     Plaintiff Jane Doe 1 is a resident of Manhattan, New York. She is the mother of one child: A.D.1, an eight-year-old boy (collectively, the "Doe 1 Family").[5] Ms. Doe 1 is Black.

32.     Plaintiff Jane Doe 2 is a resident of Queens, New York. She is the mother of three children: A.D.2, a fourteen-year-old-girl; B.D.2, a ten-year-old boy; and C.D.2, a four-year-old girl (collectively, the "Doe 2 Family").[6] Ms. Doe 2 and her children reside with her husband, the children's father. Ms. Doe 2 is Hispanic.

33.     Plaintiffs shall be collectively referred to herein as "Plaintiffs" or "Named Plaintiffs."

### Defendant

34.     Defendant City of New York (the "City") is a municipal entity created and authorized under the laws of the State of New York. The City is authorized by the State of New York to maintain ACS, the City agency responsible for investigating and prosecuting allegations of child neglect and abuse. At all relevant times hereto, the City was responsible for the policies,

---

[5]   This Complaint uses pseudonymous initials to protect the anonymity of the Doe 1 family.

[6]   This Complaint uses pseudonymous initials to protect the anonymity of the Doe 2 family.

practices, supervision, and investigations into child abuse and neglect conducted by ACS, as well as the appointment, training, supervision, promotion, and discipline of all ACS personnel.

35.     At all relevant times, the officials, supervisors, managers, caseworkers, agents, and employees of ACS were acting under the color of state law in the course and scope of their duties and functions as officials, supervisors, managers, caseworkers, agents, and employees of ACS and otherwise performed and engaged in conduct incidental to the performance of their lawful duties. The officials, supervisors, managers, caseworkers, agents, and employees acted for and on behalf of ACS with the power and authority vested in them as officials, supervisors, managers, caseworkers, agents, and employees of ACS and Defendant City.

36.     As the acts or omissions complained of in this Complaint are those of ACS, references herein to Defendant City shall refer specifically to and include the acts or omissions of ACS.

## FACTS

## I. ACS SEARCHES FAMILIES' HOMES DURING NEARLY ALL OF ITS 50,000 INVESTIGATIONS EACH YEAR, WHICH OVERWHELMINGLY CONCLUDE WITHOUT ANY JUDICIAL DETERMINATION OF WRONGDOING

37.     ACS caseworkers[7] search families' homes during nearly every one of the more than 50,000 investigations[8] the agency conducts each year.

---

[7]  As used in this Complaint, "caseworkers" refers to ACS employees who work on, direct, manage, or assist in ACS's response to reports of child abuse and maltreatment. This includes, but is not limited to, Child Protective Specialists Level I, Child Protective Specialists Level II, Child Protective Supervisors, Child Protective Managers, and other child protective and diagnostic staff.

[8]  As used in this Complaint, "investigations" includes both standard investigations and investigations classified as Family Assessment Response ("FAR"), or what ACS calls "CARES." Most ACS investigations go into the standard track. N.Y.C. ADMIN. FOR CHILD. SERVS., *Flash Report: Monthly Indicators January 2024* 7 (Jan. 2024), https://www.nyc.gov/assets/acs/pdf/data-analysis/flashReports/2024/01.pdf [hereinafter, Jan. 2024 Monthly Indicators Report]. FAR investigations mirror standard investigations in many respects, including that FAR investigations involve searches where ACS deploys its Coercive

38.     During these searches, ACS caseworkers routinely examine every room of families' homes, rifle through their belongings, and in many cases search children's bodies, all without regard to whether the scope of the searches has any relationship to the conduct being investigated.

39.     ACS investigations typically last 60 days and involve at least one—and frequently more than four—invasive searches of the family's home, and often include multiple intrusive, distressing, and degrading strip-searches of the children's bodies.

40.     ACS Commissioner Dannhauser has acknowledged the "inherently traumatic and intrusive" impact ACS investigations have on families.[9] Parents[10] are humiliated. Children must watch as their parents are forced to acquiesce to strangers in their own homes who often demand that the children disrobe and display their bodies.

41.     One ACS worker described the experience of being subjected to an ACS investigation as "being stopped and frisked for sixty days."[11]

---

Tactics to enter and search families' homes. *See* Miriam Mack *et al.*, *Written Testimony of the Article 10 Family Defense Organizations in New York City*, N.Y. ADVISORY COMM. TO THE U.S. COMM'N. ON CIVIL RIGHTS 7–8 (Aug. 19, 2023), https://cfrny.org/wp-content/uploads/2023/08/Joint-Defender-Civil-Rights-Commission-Testimony-FINAL.pdf. Indeed, according to written testimony submitted by family defense organizations, FAR investigations are "no less coercive" and "even more invasive" than standard investigations and involve caseworkers "repeatedly visiting the home for what may be longer than a typical 60–90 day ACS investigation." *Id.*

[9]   N.Y.S. Assembly Standing Committee on Children and the Family, Public Hearing: *The Child Welfare System and the Mandatory Reporting of Child Abuse or Maltreatment in New York State*, at 1:06:52–1:06:59 (Sept. 27, 2023), https://nystateassembly.granicus.com/player/clip/7735?view_id=8&redirect=true&h=60ba2bd9d82d15df6df919f7e324cec2.

[10]  For simplicity, this Complaint generally uses the term "parents" to refer to parents and others who may be investigated by ACS because they are in a legally responsible parental role.

[11]  Racial Equity Report, *supra* note 1, at 17.

*ACS Investigations Begin with a Call to the State Central Register*

42.     ACS investigations are triggered by calls to the New York Statewide Central Register of Child Abuse and Maltreatment (the "SCR"), a centralized hotline operated by New York State's Office of Children and Family Services ("OCFS").[12]

43.     Anyone may call the hotline to lodge a report of child maltreatment for any reason. Some reports are made by mandated reporters. Others are made by members of the public, who may make reports anonymously and without providing any identifying information or basis for their allegations.[13]

44.     Once ACS receives a report from the SCR about a family, the agency opens an investigation without further assessing the reliability and veracity of the allegations.[14]

45.     ACS Commissioner Dannhauser has acknowledged that many people "weaponiz[e] the SCR" through "false and malicious reporting," calling this a "real problem."[15]

46.     The New York City Bar Association has found that "a significant percentage of callers make false and malicious reports."[16]

---

[12]   N.Y. SOC. SERV. LAW § 422(2)(a).

[13]   *Id.*

[14]   *See* N.Y. SOC. SERV. LAW § 424(6)(a).

[15]   The Imprint Weekly Podcast, *America's Most High Profile Child Welfare Job: Jess Dannhauser's Plan for New York City*, IMPRINT, at 37:09–39:34 (Feb. 21, 2022), https://podcasts.apple.com/us/podcast/americas-most-high-profile-child-welfare-job-jess-dannhausers/id1533882487?i=1000551742596 [hereinafter, Imprint Weekly Podcast].

[16]   N.Y. CITY BAR ASS'N, *Report on Legislation by the Children and the Law Committee and the Council on Children: A.2479, S.902,* at 2 (2022), https://www.nycbar.org/wp-content/uploads/2023/11/20221012_AntiHarassmentinReporting_Reissued_Sept2023.pdf.

47.     For example, many abusive partners harass their victims by making repeated false and malicious reports to ACS.[17]

***ACS Conducts at Least One Home Search in Nearly All of Its Investigations***

48.     In 2023, ACS conducted 52,873 investigations into reports of suspected child abuse or neglect stemming from calls to the SCR.[18]

49.     Nearly 85% of allegations that gave rise to ACS investigations last year related solely to child neglect rather than physical or sexual abuse.[19]

50.     An overwhelming number of ACS's indicators of child neglect—such as inadequate food/clothing/shelter[20]—are closely associated with conditions of poverty rather than parents' wrongdoing.[21]

51.     Once a standard investigation begins, ACS has 60 days to decide whether the allegations are substantiated ("indicated") or unsubstantiated ("unfounded").[22]

---

[17]   *See* Imprint Weekly Podcast, *supra* note 15, at 37:09–39:34; *infra* at ¶ 198 (alleging several Named Plaintiffs have had repeated false and malicious reports called in by abusive ex-partners).

[18]   Jan. 2024 Monthly Indicators Report, *supra* note 8, at 7.

[19]   *Id.* at 32.

[20]   *Id.*

[21]   N.Y.S. COMPTROLLER, *New Yorkers in Need: A Look at Poverty Trends in New York State for the Last Decade* 1 (Dec. 2022), https://www.osc.ny.gov/files/reports/pdf/new-yorkers-in-need-poverty-trends.pdf ("Poverty has been defined generally as when an individual or household does not have the financial resources to meet basic needs such as food, clothing and shelter, or, alternatively, access to a minimum standard of living.").

[22]   N.Y. SOC. SERV. Law § 424(7).

52.     ACS's Casework Practice Requirements Manual (the "Casework Manual"), which provides "uniform practice standards" for caseworkers, instructs caseworkers that they "must visit the home" and "assess the home environment" within 24 to 48 hours of the report to the SCR.[23]

53.     After the initial home search, ACS caseworkers routinely conduct additional home searches throughout the investigation.[24]

54.     ACS requires at least bi-weekly home visits while an investigation is ongoing, meaning ACS conducts an average of four to five home searches during each investigation.[25]

***ACS's Home Searches Typically Include a Search of Every Room in Families' Homes, Their Possessions, and Children's Bodies***

55.     The Casework Manual provides that "[a]ll rooms in the home must be examined" during a home search, without regard to whether there is any reason to believe a particular room in the home has evidence of the alleged abuse or neglect being investigated.[26]

56.     The Casework Manual sets out 20 separate aspects of the home that caseworkers must evaluate during every home search, such as the refrigerator, sleeping arrangements, and paint on the walls, without regard to whether the report to the SCR concerns any of those conditions.[27]

57.     Caseworkers routinely open families' refrigerators and kitchen cabinets, examine bathrooms and medicine cabinets, look through bedrooms and closets, and scrutinize the cleanliness

---

[23]   N.Y.C. ADMIN. FOR CHILD. SERVS., *Division of Child Protection Casework Practice Requirements Manual* 5, 20 (Dec. 2020) (on file with Plaintiffs' counsel) [hereinafter, Casework Manual].

[24]   N.Y.C. ADMIN. FOR CHILD. SERVS., *Warrants, Entry Orders and Orders to Produce* (on file with Plaintiffs' counsel); N.Y.C. ADMIN. FOR CHILD. SERVS., *Warrants; Entry Orders and Orders to Produce a Child* (on file with Plaintiffs' counsel) [collectively hereinafter, Entry Order Materials].

[25]   *See* Entry Order Materials, *supra* note 24.

[26]   *See* Casework Manual, *supra* note 23, at 20.

[27]   *See id.* at 20–21.

and tidiness of their homes, without regard to whether inspecting a particular home condition has any connection to the allegation.[28]

58.      In addition to searching the entire home, caseworkers routinely conduct searches of children's bodies, requiring children to lift up and pull down their clothes.

59.       Searches of children's bodies are routine, even though the vast majority of ACS investigations do not involve any allegation of physical mistreatment.[29]

60.      An October 13, 2022 report issued by ProPublica and NBC News (the "ProPublica Report"), which was based on interviews with "[m]ore than two dozen caseworkers, parents, children and attorneys," found that ACS strip-searches children "down to their underwear" during "every or nearly every initial home visit by the agency."[30]

***Most ACS Investigations Conclude Without Any Determination of Wrongdoing***

61.      In 2022, ACS closed more than 70% of standard investigations as "unfounded."[31]

---

[28]  *See* J. Khadijah Abdurahman, *Birthing Predictions of Premature Death*, LOGIC(S) (Aug. 22, 2022), https://logicmag.io/home/birthing-predictions-of-premature-death/ (describing, in a first-person account by a reported caregiver, an agent "wander[ing] around, wordlessly inspecting [the caregiver's] house"); Michelle Burrell, *What Can the Child Welfare System Learn in the Wake of the Floyd Decision?: A Comparison of Stop-And-Frisk Policing and Child Welfare Investigations*, 22 CUNY L. Rev. 124, 131, 144 (2019) (describing a typical CPS investigation); Asher Lehrer-Small, *Exclusive Data: Educators' 'Careless' Child Abuse Reports Devastate Thousands of NYC Families*, THE 74 (OCT. 6, 2022), https://www.the74million.org/article/exclusive-data-educators-careless-child-abuse-reports-devastate-thousands-of-nyc-families/.

[29]  Jan. 2024 Monthly Indicators Report, *supra* note 8, at 32.

[30]  Eli Hager, *Police Need Warrants to Search Homes. Child Welfare Agents Almost Never Get One*, PROPUBLICA (Oct. 13, 2022), https://www.propublica.org/article/child-welfare-search-seizure-without-warrants [hereinafter, ProPublica Report].

[31]  N.Y.C. ADMIN. FOR CHILD. SERVS., *Abuse/Neglect Investigations by Community District, 2017–2022*, at 4, https://www.nyc.gov/assets/acs/pdf/data-analysis/abuseneglectreport17to22.pdf (last visited Feb. 17, 2024) [hereinafter, ACS Investigations Summary].

62.     ACS closes an investigation as unfounded if ACS "did not find enough evidence to support the claim that a child has been abused or neglected."[32]

63.     Even among those investigations that ACS does not close as unfounded, few lead to any case filed in court and even fewer to judicial findings of wrongdoing against the families subject to the investigation.

64.     In 2022, less than 7% of all investigations led ACS to file abuse or neglect petitions against parents or other caretakers in Family Court.[33]

65.     Although the vast majority of cases close without any judicial finding of wrongdoing, ACS routinely conducts multiple invasive home searches during each investigation without regard to whether the searches have any relationship to the allegations or the strength of the evidence supporting them.

66.     These invasive searches do not increase child safety. There was no increase in child abuse during the first years of the COVID-19 pandemic, when ACS's home entries and searches were dramatically curtailed.[34] Indeed, ACS itself acknowledged that the City's children stayed just as safe in the absence of ACS's usual investigatory practices.[35]

---

[32]  N.Y.C. ADMIN. FOR CHILD. SERVS., *A Parent's Guide to a Child Abuse Investigation*, https://www.nyc.gov/site/acs/child-welfare/parents-guide-child-abuse-investigation.page#:~:text=Unfounded%20means%20that%3A,that%20the%20report%20was%20unfounded (last visited Feb. 17, 2024) [hereinafter, A Parent's Guide].

[33]  N.Y.C. Council Comm. Oversight & Investigations, *Meeting Video: Hearing on Oversight – Operational Challenges in Family Court*, N.Y.C. COUNCIL, at 1:05:30 (Apr. 24, 2023), https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=1091239&GUID=8A7EE7BF-4A7E-4A17-989C-44138BCA277C&Options=&Search=.

[34]  Melissa Friedman & Daniella Rohr, *Reducing Family Separations in New York City: The Covid-19 Experiment and A Call for Change*, 123 COLUM. L. REV. F. 52, 53, 68–71 (2023).

[35]  *See id.* at 69 (quoting testimony of former ACS Commissioner David Hansell); Michael Fitzgerald, *No Evidence of Pandemic Child Abuse Surge in NYC, But Some See Other Crises for Child Welfare System*, IMPRINT (June 15, 2021), https://imprintnews.org/top-stories/no-evidence-of-pandemic-child-abuse-surge-in-new-york-city-but-some-see-other-crises-for-child-welfare-system/55991 (same).

## II.   ACS MAINTAINS A WIDESPREAD POLICY, CUSTOM, AND PRACTICE OF COERCING CONSENT TO SEARCH HOMES WITHOUT A COURT ORDER OR EXIGENT CIRCUMSTANCES

67.     Defendant City of New York knows that more than 50,000 times a year, ACS caseworkers will enter and search the homes of families subject to the agency's investigations.

68.     Caseworkers use the Coercive Tactics to carry out these entries and searches in non-emergency circumstances instead of obtaining a court order or voluntary consent.

69.     ACS fails to provide adequate policies, procedures, training, or supervision regarding families' Fourth Amendment rights with respect to home entries and searches.

### A.   ACS Maintains a Widespread Policy, Custom, and Practice of Using Highly Coercive Tactics to Enter and Search Families' Homes

70.     In order to legally conduct home searches in the absence of a court order or exigent circumstances, ACS must receive voluntary consent to enter and search the home.[36]

71.     During tens of thousands of warrantless, non-exigent searches every year, ACS does not obtain voluntary consent to enter and search families' homes.

72.     To effectuate home entries and searches, ACS maintains a widespread custom, policy, and practice of coercing parents into allowing ACS caseworkers to enter and search their homes in violation of the Fourth Amendment.

73.     ACS uses a series of Coercive Tactics to enter and search families' homes without obtaining voluntary consent:

---

[36]   *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *see also Southerland v. City of New York*, 680 F.3d 127, 143–49 (2d Cir. 2012) (holding that "plaintiffs' Fourth Amendment unlawful-search claims" against ACS survived summary judgment); *Tenenbaum v. Williams*, 193 F.3d 581, 602 n.14 (2d Cir. 1999) (explaining, in an ACS case, that "[t]he Fourth Amendment's search and seizure provisions are applicable"); *Phillips v. Cnty. of Orange*, 894 F. Supp. 2d 345, 371–72 (S.D.N.Y. 2012) (holding that parents stated claim that ACS home search violated their Fourth Amendment right where they alleged lack of voluntary consent).

a. <u>ACS threatens to take parents' children away</u>: ACS caseworkers tell or imply to parents that the agency will take their children away if they refuse to let ACS enter and search the home, even though the children are not in imminent danger of harm to justify such a removal.

b. <u>ACS threatens to call the police</u>: ACS caseworkers tell parents ACS will call the police to come to the family's home if the parents do not let them enter and search the home, even though there are not emergency circumstances that would justify forcible, warrantless entry by the police.

c. <u>ACS tells parents they have no choice</u>: Even when there are no exigent circumstances, ACS caseworkers tell parents that they "must," "need to," "have to," or "are required to" let ACS enter and search their homes.

d. <u>ACS abuses and misrepresents its authority</u>: In the absence of exigent circumstances, ACS caseworkers illegally seize and strip-search children and convey to parents that ACS does not need a court order to enter and search the home, creating the impression that parents do not have the choice to decline ACS's requests or resist ACS's demands to conduct home searches.

e. <u>ACS does not meaningfully inform parents of their rights</u>: ACS caseworkers frequently do not inform parents that they have the right to refuse, limit, and revoke consent when ACS seeks to enter and search their homes without a court order and in the absence of exigent circumstances. When ACS caseworkers do inform parents of the right to refuse entry, they do so ineffectively.[37]

---

[37] ACS recently announced a "pilot program" in which caseworkers give certain parents a palm card that says parents can "choose not to let ACS into [their] home" but also falsely implies that a home search is legally required and inevitable. Press Release, N.Y.C. ADMIN. FOR CHILD.

f.   <u>ACS makes a public scene</u>: ACS caseworkers intentionally bang on front doors and announce their presence loudly enough so neighbors can see and hear, pressuring parents to let them in or face the stigma of their neighbors learning they are under ACS investigation.

74.     ACS's widespread use of these Coercive Tactics reflects a deliberate choice to discourage caseworkers from seeking court orders and instead to use coercion to enter and search families' homes in non-exigent situations.

75.     The purpose of the Coercive Tactics is the same in every case: in non-exigent circumstances, to coerce parents or caretakers into permitting ACS caseworkers to enter and search their homes—and often search their children's bodies—without having to go through the process of obtaining a court order or voluntary consent.

> **B.     ACS's Use of Coercive Tactics to Enter Families' Homes Is Well Documented**

76.     ACS knows about and is deliberately indifferent to the agency's widespread policy, custom, and practice of using these Coercive Tactics to enter and search families' homes. This practice has been extensively documented in (i) ACS's own reports and informational materials, (ii) media and academic reports, (iii) parents' and advocates' legislative testimony, (iv) prior lawsuits, and (v) ACS's statements.

77.     ***ACS Parent Information Guides***: ACS's Parent's Guide Pamphlet, a publicly available online resource designed for all parents facing ACS investigations, begins, in bolded

---

SERVS., Administration for Children's Services Expands Pilot Program to Help Parents Better Understand Their Rights When There Is a Child Protective Investigation (Jan. 11, 2024), https://www.nyc.gov/assets/acs/pdf/PressReleases/2024/pilot-program-parents-rights.pdf. Upon information and belief, ACS will not distribute the palm cards in a significant percentage of investigations.

letters, with a foreboding question: "**Will my child be taken from me?**"[38] For families who are

undergoing a home visit from ACS, it states that a Child Protective Specialist ("CPS") "<u>will</u> meet

with you" and "<u>will</u> assess your home."[39] This information is repeated on ACS's website, which

states that a CPS caseworker "<u>will</u> . . . [m]ake an unannounced visit to your home within 24-48

hours of the report," "<u>must</u> see and speak with all your biological children living with you or with

other caretakers," and "<u>will</u> . . . [c]heck to make sure your home is free of hazards, has adequate

food, safe sleeping arrangements, etc."[40]

78.     By repeatedly using mandatory language such as "will" and "must," ACS primes

parents with the threat that being perceived as uncooperative risks family separation, misrepresents

the law, and preys on parents' primordial fear by sending a clear and unmistakable message that

parents have no choice but to let ACS caseworkers conduct home searches during the agency's

investigations.

79.     ACS directs parents who want "more information about [their] rights if [they] are

named in a report," to go to a link on the New York State Office of Child and Family Services

website.

80.     Nowhere on that website does it state that parents have the right to refuse, limit, or

revoke consent for entries and searches.[41]

---

[38]   N.Y.C. ADMIN. FOR CHILD. SERVS., *A Parent's Guide To Child Protective Services in New York City*, https://www.nyc.gov/assets/acs/pdf/child_welfare/investigation/guide/ParentsGuide.pdf (last visited Feb. 17, 2024).

[39]   *Id.* (emphasis added).

[40]   A Parent's Guide, *supra* note 32 (emphasis added).

[41]   *See* OFF. OF CHILD. & FAM. SERVS., *Child Protective Services FAQ*, https://ocfs.ny.gov/programs/cps/FAQ.php#my_rights (last visited Feb. 17, 2024).

81.     ***Internal ACS Reports:*** ACS's internal reports show that the agency's reliance on the Coercive Tactics to gain entry into and search families' homes goes back nearly two decades.

82.     In a February 2007 joint report by ACS and the New York City Department of Investigation ("DOI"), ACS staff told DOI "that they consider entry warrants to be an extreme remedy," and that supervisors instruct them to "attempt additional home entries before seeking any warrants," even after parents refuse consent to entry.[42] An ACS attorney interviewed for the DOI Report confirmed that ACS "rarely sought warrants of entry."[43]

83.     A 2020 ACS internal audit that included interviews with more than 50 caseworkers concluded that ACS "incentivizes [caseworkers] to be invasive and not tell parents their rights" during investigations.[44]

84.     ***Media and Academic Reports***: ACS caseworkers and investigated parents have described ACS's rampant use of the Coercive Tactics in the media and in academic reports.

85.     The 2022 ProPublica Report, which documented ACS's long-standing practice of warrantless home searches, concluded that "caseworkers frequently say things that are coercive and manipulative in order to get inside homes without going to a judge."[45]

86.     Nine former caseworkers interviewed as part of the ProPublica Report "acknowledged that they had near complete access to families' homes" and that they "would use

---

[42]   Ross Gill Hearn & John B. Mattingly, *A Department Examination of Eleven Child Fatalities and One Near Fatality*, at 14–15 (Aug. 2007), https://www.nyc.gov/assets/doi/reports/pdf/2007/2007-08-09-Acsreport_pdfaug.pdf.

[43]   *Id.*

[44]   Racial Equity Report, *supra* note 1, at 18.

[45]   ProPublica Report, *supra* note 30.

lines" like "I'm not going to stop coming" to "up the pressure" on families to let them into the home without a court order.[46]

87.     A former NYPD officer—now a Professor at the John Jay College of Criminal Justice—who frequently received calls to assist ACS caseworkers expressed "amazement that caseworkers could comb through whatever they wanted within a home as if they had a 'blank check' instead of a warrant."[47]

88.     A 2021 report from the NYU Wagner School of Public Policy also highlights ACS's use of the Coercive Tactics. The report describes how ACS routinely "demands access to the home without a court order"; caseworkers "often provide . . . misinformation to parents about the scope of the government's power in order to gain access to the home"; and caseworkers "regularly tell parents that if they fail to cooperate with their demands, their children will be removed," even though "New York law is clear that, absent a true emergency, ACS cannot enter a home and interview children without a court order or a parent's permission."[48]

89.     In an interview with New York One, an ACS caseworker acknowledged that the Coercive Tactics prey on families' fears about ACS investigations, explaining that a knock on the front door from ACS instills "a lot of fear" because parents are terrified that ACS is "coming in to remove the children."[49]

---

[46]    *Id.*

[47]    *Id.*

[48]    Parent Legis. Action Network Coal. & Bronx Defs., *Family Court Justice: Miranda Rights for Families*, NYU WAGNER SCH. PUB. POL'Y 2, 4, 5 (Oct. 2021), https://wagner.nyu.edu/files/nyc2025/Bronx%20Defenders_NYU%20Policy%20Project%20-%20Family%20Miranda%20-%20DRAFT.pdf.

[49]    N.Y. One Online, *Protecting Our Children Part 1: Inside ACS*, SPECTRUM LOCAL NEWS, at 4:35–4:40 (Jan. 5, 2017), https://spectrumlocalnews.com/city-hall-newsmakers/2017/01/5/ny1-online--protecting-our-children-part-1--inside-acs. **Error! Bookmark not defined.**

90.     ***Testimony from Parents and Advocates***: Parents who have been investigated by ACS and family advocates have testified to the New York City Council and New York State Legislature regarding ACS's widespread use of the Coercive Tactics during hearings on currently pending legislation at the City and State levels that would require ACS to inform families of various rights, including the right not to consent to a home search, when ACS arrives at the door at the outset of an investigation.

91.     The proposed, pending legislation is a direct response to ACS's widespread use of the Coercive Tactics. A Sponsor Memo for the New York State Senate's version of the bill describes how families "are pressured to allow CPS caseworkers into their home without full knowledge of their legal rights," including under false threats that their children will be removed if they do not let caseworkers in.[50]

92.     At a City Council hearing, one parent described how ACS "push[es] their way into your home" by "bringing the police into your home" and threatening to remove children if consent is refused.[51]

93.     At a State Assembly hearing, another parent explained that ACS "mak[es] unexpected visits to the parent[s'] homes, banging on our doors and threatening the parents and frightening our children at all times of the day and night."[52]

---

[50]   N.Y.S. Senate, Sponsor Memo, S5484, 2021–2022 Sess. (2021), https://www.nysenate.gov/legislation/bills/2021/S5484.

[51]   N.Y.C. Council Comm. on Gen. Welfare, *Meeting Video: Hybrid Hearing, Int. 0294-2022 et al.*, N.Y.C. COUNCIL, at 01:33:00–01:46:00 (June 15, 2022), https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=980212&GUID=A8D3B21B-BF60-4D96-A561-83B00D3C67B5&Options=&Search=.

[52]   N.Y.S. Assembly Standing Comm. on Child. & the Fam., *Transcript of Public Hearing: Family Involvement in the Child Welfare System*, at 143:22–144:2 (Oct. 21, 2021), https://nystateassembly.granicus.com/DocumentViewer.php?file=nystateassembly_262a249a9469f9dc7c36993c0932b0d2.pdf&view=1.

94.     An attorney leading the family defense practice of a public defender office in New York City, who has substantial experience representing parents subjected to ACS investigations, similarly testified to the State Assembly about how caseworkers "use misinformation and the threat of family separation and police involvement to coerce vulnerable families to relinquish their constitutional rights before a court is even involved."[53]

95.     ***Prior Lawsuits***: Numerous prior lawsuits have alleged that ACS used the Coercive Tactics to enter and search families' homes. *See*, *e.g.*, Complaint, *L.B. v. City of New York*, *et al.*, No. 23 Civ. 8501 (E.D.N.Y. Nov. 15, 2023) (in non-exigent circumstances, caseworkers used multiple Coercive Tactics including arriving with law enforcement, telling a mother she was required to let them in, and telling a mother that letting caseworkers in was the only way to stop ACS visits); First Amended Complaint ¶¶ 49–52, *Ferguson v. City of New York, et al.*, No. 22 Civ. 1000 (S.D.N.Y. Jul. 7, 2022) (in non-exigent circumstances, caseworkers came to door with police at around 4:30 a.m. and claimed to have a court order to authorize entry but did not have one); Complaint ¶¶ 19–33, *D.L. v. Hansell et al.*, No. 17 Civ. 7037 (S.D.N.Y. Sept. 15, 2017) (in non-exigent circumstances, caseworkers told parents they had a legal right to search home and strip-search children without a court order); *Doe v. Mattingly*, No. 06 Civ. 5761, 2006 WL 3498564, at *2 (E.D.N.Y. Nov. 6, 2006) (in non-exigent circumstances, ACS conducted multiple home searches and strip-searches of child without regard to mother's denial of consent); *People United for Children, Inc. v. City of New York*, 108 F. Supp. 2d 275, 299 (S.D.N.Y. 2000) (defendants entered families' "homes without obtaining a warrant or consent to conduct non-emergency abuse investigations").

---

[53]  *Id.* at 158:21–159:2.

96.     ***ACS's Statements***: ACS Commissioner Dannhauser has repeatedly acknowledged the importance of families under ACS investigation being notified of their right to deny ACS caseworkers entry into their homes.[54]

97.     The Commissioner has further recognized that Black and Hispanic families face a greater risk of coercion because "it is more likely that a white family will close the door and call a lawyer, or certainly a family with means will do that. And so, we want to make sure that families know their rights."[55]

### C.   ACS Overwhelmingly Fails to Seek Court Orders to Enter and Search Families' Homes Despite the Availability of a Clear Process to Obtain Them

98.     ACS has intentionally chosen to use the Coercive Tactics although a readily available legal procedure exists for obtaining a court order to enter and search families' homes.

99.     The New York Family Court Act establishes a clear process that is "available at all hours" of the day for caseworkers to obtain court orders ("Entry Orders") to authorize home entries and searches in the absence of parental consent. Caseworkers can seek these orders in person, in writing, or by phone.[56]

100.    The procedure for ACS to obtain Entry Orders under the Family Court Act is "the same as for a search warrant under article six hundred ninety of the criminal procedure law."[57]

---

[54]  *See* Jess Dannhauser & Anne Williams-Isom, *Protecting children & protecting their families*, DAILY NEWS (Dec. 15, 2022), https://www.nydailynews.com/2022/12/15/protecting-children-protecting-their-families/; Chatodd Floyd, N.Y.C. Off. of the Mayor, Memorandum in Opposition, S-7553.A, 2019–2020 Sess., at 3 (Feb. 25, 2020) (on file with Plaintiffs' counsel).

[55]  The Imprint Weekly Podcast, *supra* note 15 at 34:12–36:41.

[56]  N.Y. FAM. CT. ACT § 1034(2)(f).

[57]  *Id*. § 1034(2)(c).

101.     As the Second Circuit explained in a New York City case, in ACS "investigations, a Family Court order is equivalent to a search warrant for Fourth Amendment purposes." *Southerland v. City of New York*, 680 F.3d 127, 144 n.15 (2d Cir. 2012).

102.     ACS may obtain an Entry Order only "where there is probable cause to believe that an abused or neglected child may be found on the premises" to which entry is sought.[58]

103.     Family courts may only grant Entry Orders that are "necessary" in light of the children's safety and may only authorize actions that are "the least intrusive to the family."

104.     To issue an Entry Order, family courts must weigh factors including "the nature or seriousness of the allegations," "the potential harm to the child or children" absent the search, the reliability of the report to the SCR, and the strength of the evidence supporting it.[59]

105.     Despite clear standards and an available process to obtain Entry Orders at all hours of the day, ACS virtually never seeks Entry Orders to authorize the home entries and searches it conducts as part of nearly every investigation.

106.     In 2023, ACS sought Entry Orders in just 0.4% of its investigations. It conducted 52,873 investigations and made just 222 applications for Entry Orders.[60]

107.     ACS's practice of failing to seek Entry Orders in virtually all of its investigations is long-standing:

---

[58]   *Id*. § 1034(2)(b)(i).

[59]   *See id*. §§ 1034(2)(d) and (e).

[60]   Jan. 2024 Monthly Indicators Report, *supra* note 8, at 7; N.Y.C. ADMIN. FOR CHILD. SERVS., *Child Welfare Indicators Annual Report 2023* 16 (2023), https://www.nyc.gov/assets/acs/pdf/data-analysis/2023/CityCouncilReportCY2023.pdf [hereinafter, 2023 Child Welfare Indicators Annual Report].

    a.   In 2022, ACS conducted approximately 51,117 investigations and sought 202 Entry Orders (0.4% of investigations).[61]

    b.   In 2021, ACS conducted approximately 47,648 investigations and sought 223 Entry Orders (0.5% of investigations).[62]

    c.   In 2020, ACS conducted approximately 39,901 investigations and sought 219 Entry Orders (0.5% of investigations).[63]

    d.   And in 2019, ACS conducted approximately 52,317 investigations and sought 203 Entry Orders (0.4% of investigations).[64]

---

[61] N.Y.C. ADMIN. FOR CHILD. SERVS., *Flash Report: Monthly Indicators January 2023* 5 (2023), https://www.nyc.gov/assets/acs/pdf/data-analysis/flashReports/2023/01.pdf [hereinafter, Jan. 2023 Monthly Indicators Report]; N.Y.C. ADMIN. FOR CHILD. SERVS., *Child Welfare Indicators Annual Report 2022* 16 (2022), https://www.nyc.gov/assets/acs/pdf/data-analysis/2022/CityCouncilReportCY2022.pdf [hereinafter, 2022 Child Welfare Indicators Annual Report].

[62] Jan. 2023 Monthly Indicators Report, *supra* note 61, at 5; N.Y.C. ADMIN. FOR CHILD. SERVS., *Child Welfare Indicators Annual Report 2021* 16 (2021), www.nyc.gov/assets/acs/pdf/data-analysis/2021/CityCouncilReportCY2021.pdf [hereinafter, 2021 Child Welfare Indicators Annual Report].

[63] N.Y.C. ADMIN. FOR CHILD. SERVS., *Flash Report: Monthly Indicators, December 2020* 5 (2020), http://www.nyc.gov/assets/acs/pdf/data-analysis/flashReports/2020/12.pdf [hereinafter Dec. 2020 Monthly Indicators Report]; N.Y.C. ADMIN. FOR CHILD. SERVS., *Child Welfare Indicators Annual Report 2020* 16 (2020), https://www.nyc.gov/assets/acs/pdf/data-analysis/2020/CityCouncilReportCY2020.pdf [hereinafter, 2020 Child Welfare Indicators Annual Report].

[64] Dec. 2020 Monthly Indicators Report, supra note 63, at 5; N.Y.C. Admin. For Child. Servs., Child Welfare Indicators Annual Report 2019 16 (2019), https://www.nyc.gov/assets/acs/pdf/child_welfare/2020/CWIndicatorsAnnualCityCouncilReportCY2019.pdf [hereinafter, 2019 Child Welfare Indicators Annual Report].

**D.    The Overwhelming Majority of ACS Investigations Do Not Involve Imminent Danger to a Child to Justify Warrantless Home Entries and Searches Without Consent**

108.    ACS does not require staff to assess or document whether there are emergency circumstances to justify a warrantless home search at the time they demand to enter and search a home.

109.    While ACS does not document assertions of exigent circumstances to justify a warrantless home search at the time its caseworkers demand to enter and search a home, ACS does claim exigent circumstances as the basis to remove children without a court order in 1.5% of investigations.[65]

110.    As ACS obtains a court order for a home search in less than 0.5% of its investigations, in more than 99.5% of its investigations, the agency searches families' homes without a court order or claimed exigent circumstances.

**E.    ACS Fails to Adequately Train or Supervise Its Caseworkers About Parents' Fourth Amendment Rights During Home Entries and Searches**

111.    ACS provides inadequate training and supervision to caseworkers regarding parents' Fourth Amendment rights during home entries and searches, even though it knows caseworkers will seek to enter and search families' homes during nearly every single one of the agency's more than 50,000 investigations every year.

112.    The ACS Casework Manual, which delineates the practice standards caseworkers must follow during investigations, fails to give caseworkers adequate guidance or instructions

---

[65]    In these cases, ACS asserts in an attachment to the court petitions that children were in imminent danger justifying emergency removal prior to any court hearing. ACS removed 1,369 children on an alleged emergency basis in 2022. 2022 Child Welfare Indicators Annual Report, *supra* note 61, at 17. This represents 1.5% of children subject to an ACS investigation that year. N.Y.C. ADMIN. FOR CHILD. SERVS., *Demographics of Children and Parents at Steps in the Child Welfare System, FY 2022*, 1 https://www.nyc.gov/assets/acs/pdf/data-analysis/2022/demographics-children-fy-2022.pdf [hereinafter, 2022 Demographics Report].

regarding parents' Fourth Amendment rights in connection with ACS home entries and searches.[66]

113.    The Casework Manual does not contain the words "Fourth Amendment" or "Constitution" in its entire section on "Home Assessment," which is the section of the Manual instructing caseworkers how to conduct home searches.[67] Indeed, the words "Fourth Amendment" appear nowhere in the entire Casework Manual.

114.    The Casework Manual provides inadequate guidance and instructions regarding (i) the circumstances under which caseworkers may enter and search families' homes without a warrant; (ii) the distinction between exigent and non-exigent circumstances to justify a warrantless home entry; and (iii) the meaning of obtaining "voluntary consent" to enter and search the home or guidance on the sorts of Coercive Tactics that would vitiate voluntary consent.[68]

115.    The Casework Manual does not adequately inform caseworkers that parents have the right to decline or limit consent or to revoke previously given consent for ACS to enter and search the home in the absence of a court order authorizing the search or exigent circumstances.[69]

116.    The Casework Manual does not adequately train caseworkers to inform parents of their rights before entering and searching their homes, leading caseworkers to systematically neglect to give parents that information.

117.    Instead, the Casework Manual instructs caseworkers only to "[m]ake [a] referral to [ACS's legal counsel] to obtain an entry order or warrant if needed."[70]

---

[66]    *See* Casework Manual, *supra* note 23, at 20–23.

[67]    *Id.*

[68]    *Id.*

[69]    *Id.*

[70]    *Id.* at 21.

118.    The ACS caseworkers interviewed in the ProPublica Report confirm the lack of adequate training on parents' Fourth Amendment rights. As one caseworker explained with regard to home searches: "Rights—no, we never did that, I didn't even know that was a thing."[71]

119.    At the same time, the Casework Manual instructs caseworkers to search "[a]ll rooms" in the home and "[a]ssess/describe/document" 20 different aspects of the home environment, such as "peeling paint" and "heavy traffic of adults in the home," without regard to whether the conduct being investigated has anything to do with those conditions.[72]

120.    ACS's other training materials instruct caseworkers that when "a parent or caretaker blocks [the caseworker's] access to seeing and interviewing a child[,]" caseworkers "must be _insistent_" in "presenting [their] authority as an ACS investigator to a parent/caretaker" in order to "access that child(ren)."[73]

121.    ACS's failure to provide caseworkers with adequate training regarding families' Fourth Amendment rights with respect to home searches falls far short of other agencies that regularly conduct home searches, such as the New York City Police Department ("NYPD"). Unlike ACS, the NYPD uses training materials that reference the requirements of the Fourth Amendment with respect to home searches and specifically instruct officers that consent to enter and consent to search must be obtained voluntarily without coercion.[74] The NYPD's training materials further

---

[71]    ProPublica Report, _supra_ note 30.

[72]    Casework Manual, _supra_ note 23, at 20.

[73]    N.Y.C. ADMIN. FOR CHILD. SERVS., _Children's Services CPS Core Practice Curriculum: Minimizing Resistance and Managing Authority while Conducting the CPS Investigation_, at 613–14 (2008) (on file with Plaintiffs' counsel) (emphasis in original); N.Y.C. ADMIN. FOR CHILD. SERVS., _Child Protective Specialist Practice Core: A Learning Program for NYC Child Welfare Professionals_, Module 3 – Unit 3, at 46 (2018) (on file with Plaintiffs' counsel).

[74]    N.Y. POLICE DEP'T., _Police Student's Guide_, at 448 (2005), https://www.prisonlegalnews.org/media/publications/Police%20Student's%20Guide%2C%20NYPD%2C%202005.pdf.

instruct that arriving in the middle of the night may be coercive.[75] And the NYPD uses a Consent to Search form, which officers provide when effectuating home searches and have the person providing putative consent fill out.[76]

122.    The absence of adequate training and supervision ACS provides to caseworkers regarding Fourth Amendment rights during home searches demonstrates a deliberate choice by the agency to encourage caseworkers' widespread use of the Coercive Tactics to force their way into and search families' homes without a court order. It also reflects the agency's stated position—in brazen disregard of binding Second Circuit precedent—that the Fourth Amendment does not apply to ACS.[77]

---

[75] *Id.*

[76] The NYPD's Consent to Search form (1) requires the person write their identifying information and what is permitted to be searched; (2) alerts that the purpose of the search is to discover "evidence, or contraband"; (3) requires the person to "have been advised of [their] right to refuse consent before any search is conducted"; (4) requires the person to agree that they understand their right to revoke consent "in whole or in part, at anytime"; (5) requires the person to agree they are consenting "knowingly, voluntarily, and intelligently and without threats or promises of any kind"; (6) requires the person to sign and date the form; and (7) requires names and identifying information from the officer, a witness, and a supervisor. NYPD Consent to Search Form, PD 541-030 (Rev. 10-16) (on file with Plaintiffs' counsel).

[77] *Compare* ProPublica Report, *supra* note 30 at 7 (reporting that ACS officials "drew a distinction between their work and what police do, saying that the Fourth Amendment applies only to the criminal justice system and that entry orders are categorically different from search warrants") *with Southerland v. City of New York*, 680 F.3d 127, 143–49 (2d Cir. 2012) (holding that "plaintiffs' Fourth Amendment unlawful-search claims" against ACS based on court-ordered search of home for children survived summary judgment); *Tenenbaum v. Williams*, 193 F.3d 581, 602 n.14 (2d Cir. 1999) (explaining, in an ACS case, that "[t]he Fourth Amendment's search and seizure provisions are applicable . . . through the Fourteenth Amendment's Due Process Clause").

### III.   ACS USED THE COERCIVE TACTICS TO ENTER AND SEARCH PLAINTIFFS' HOMES

#### A.   The Gould Family

123.   Between May 2021 and May 2023, ACS used the Coercive Tactics to conduct at least 12 warrantless, non-exigent searches of Ebony Gould's home.

124.   ACS used the Coercive Tactics to gain entry into the Gould Family home and conduct the warrantless, non-exigent searches, including: (1) deceptively stating that the searches were mandatory and that it was "protocol" for ACS to enter the home; (2) threatening that if ACS was not given access to the home, they would have to come back with authorities, and subsequently returning with law enforcement; (3) threatening that if ACS was not given access to the home they would take her children away; (4) banging on her door and her neighbors' doors and speaking with her neighbors; and (5) failing to inform or advise Ms. Gould that she had the right not to permit ACS to enter and search the home or that she could limit or revoke her consent.

125.   ACS's use of these Coercive Tactics led Ms. Gould to reasonably believe she had no choice but to allow ACS to enter and search her home each time.

126.   During the home searches ACS executed pursuant to these Coercive Tactics, ACS searched every room in Ms. Gould's home.

127.   ACS also strip-searched N.G., X.D., and G.D. without a court order authorizing the searches and without any signs of physical abuse. N.G. was between sixteen and eighteen years old, X.D. was between six and eight years old, and G.D. was between four and six years old at the time of these searches.

128.   ACS conducted each search of the Gould Family's home without a court order, without voluntary consent, and without exigent circumstances.

129.   ACS conducted these invasive investigations in response to allegations of neglect.

130.     On or around May 4, 2023, ACS closed the most recent investigation of Ms. Gould. Her children were never removed, no court case was ever filed, and the investigations were ultimately unfounded.

131.     ACS's invasive and unconstitutional searches of Ms. Gould's home caused Ms. Gould and her children to suffer severe trauma that remains with them today.

**B.     The Taylor Family**

132.     Between September 2022 and November 2022, ACS used the Coercive Tactics to conduct at least five warrantless, non-exigent searches of Curtayasia Taylor's home.

133.     ACS used the Coercive Tactics to gain entry into the Taylor Family home and conduct the warrantless, non-exigent searches, including: (1) deceptively stating that the searches were required by law, including that ACS "needed to" check the apartment and that Ms. Taylor had no choice but to comply; (2) threatening to take Ms. Taylor's children from her custody, stating that if she refused to permit access to the home ACS would get a court order to remove the children; (3) repeatedly and aggressively threatening to return to Ms. Taylor's home with law enforcement in order to take the children; and (4) failing to inform or advise Ms. Taylor that she had the right not to permit ACS to enter and search the home or that she could limit or revoke her consent.

134.     ACS went so far as to tell Ms. Taylor that her children were "no longer [her] children" and, instead, clients of ACS to whom she could not talk without ACS's permission.

135.     ACS's use of these Coercive Tactics led Ms. Taylor to reasonably believe she had no choice but to allow ACS to enter and search her home.

136.     During the home searches ACS executed pursuant to these Coercive Tactics, ACS repeatedly searched throughout Ms. Taylor's home, including the kitchen, the cabinets, the refrigerator, the closets, and under the beds.

137.    ACS also strip-searched A.V. without a court order authorizing the search and without any signs of physical abuse. A.V. was six years old at the time of this search.

138.    ACS conducted each search of the Taylor Family's home without a court order, without voluntary consent, and without exigent circumstances.

139.    ACS conducted this invasive investigation in response to an allegation of neglect.

140.    On or around November 29, 2022, ACS closed the investigation into Ms. Taylor. Her children were never removed, no court case was ever filed, and the investigation was ultimately unfounded.

141.    ACS's invasive and unconstitutional searches of Ms. Taylor's home caused Ms. Taylor and her children to suffer severe trauma that remains with them today.

**C.    The Warmington Family**

142.    Between April 2021 and June 2021, ACS used the Coercive Tactics to conduct at least four warrantless, non-exigent searches of Plaintiff Shavona Warmington's home.

143.    ACS used the Coercive Tactics to gain entry into the Warmington Family home and conduct the warrantless, non-exigent searches, including (1) falsely stating that the searches were required by law, including that ACS "needs" to come in and telling Ms. Warmington she had to let them in; (2) threatening that if Ms. Warmington did not let ACS into her home, ACS would have to bring the police; (3) banging loudly on her door so the neighbors could hear; and (4) failing to inform or advise Ms. Warmington that she had the right not to permit ACS to enter and search the home or that she could limit or revoke her consent.

144.    ACS's use of these Coercive Tactics led Ms. Warmington to reasonably believe she had no choice but to allow ACS to enter and search her home.

145.    During the home searches ACS executed pursuant to these Coercive Tactics, ACS searched every room of Ms. Warmington's home and rifled through her refrigerator, kitchen

cabinets, and closets.

146.     ACS also strip-searched L.B., P.W., and E.W. without a court order authorizing the searches and without any signs of physical abuse. L.B. was eight years old, P.W. was six years old, and E.W. was approximately one year old at the time of these searches.

147.     ACS conducted each search of the Warmington Family's home without a court order, without voluntary consent, and without exigent circumstances.

148.     ACS conducted the invasive investigation in response to an allegation of neglect.

149.     On or around June 3, 2021, ACS closed its investigation into Ms. Warmington. Her children were never removed, no court case was ever filed, and the investigation was ultimately unfounded.

150.     ACS's invasive and unconstitutional searches of Ms. Warmington's home caused Ms. Warmington and her children to suffer severe trauma that remains with them today.

**D.     The Hackett Family**

151.     In July 2021, ACS used the Coercive Tactics to conduct one warrantless, non-exigent search of Shalonda Curtis-Hackett and Christopher Hackett's home.

152.     ACS used the Coercive Tactics to gain entry into the Hackett Family home and conduct the warrantless, non-exigent search, including: (1) deceptively stating that the search was mandatory and that they had no option but to let ACS enter the home; (2) threatening that if ACS was not given access to the home, ACS would have to come with the police; and (3) failing to inform or advise the Hacketts that they had the right not to permit ACS to enter and search the home or that they could limit or revoke their consent.

153.     ACS's use of these Coercive Tactics led the Hacketts to reasonably believe they had no choice but to allow ACS to enter and search their home.

154.    During the home search ACS executed pursuant to these Coercive Tactics, ACS searched every room in the Hacketts' apartment.

155.    ACS conducted the search of the Hackett Family's home without a court order, without voluntary consent, and without exigent circumstances.

156.    ACS conducted this invasive investigation in response to an allegation of neglect.

157.    On or around July 20, 2021, ACS closed the investigation. The children were never removed, no court case was ever filed, and the investigation was not ultimately indicated.[78]

158.    ACS's invasive and unconstitutional search of the Hacketts' home caused Ms. Curtis-Hackett, Mr. Hackett, and their children to suffer severe trauma that remains with them today.

### E.    The Azar-Eng Family

159.    Between May 2022 and July 2022, ACS used the Coercive Tactics to conduct three warrantless, non-exigent searches of Plaintiffs Marianna Azar and Mathew Eng's home.

160.    ACS used the Coercive Tactics to gain entry into the Azar-Eng Family home and conduct the warrantless, non-exigent searches including: (1) falsely stating that the searches were required by law, including that ACS "needs" to access the home and—in response to Ms. Azar asking for a warrant—that "the agency does not need a warrant or court order to complete a visit"; and (2) failing to inform or advise Ms. Azar and Mr. Eng that they had the right not to permit ACS

---

[78]   The Hackett Family's case was designated a FAR investigation. *See supra* note 8. FAR investigations do not result in a culpability determination. However, caseworkers must "constantly assess[] safety and risk" during FAR investigations, and "[i]f, while working with a family, a FAR caseworker had serious concerns about the immediate safety of a child, the child protective service would have to open [a standard] investigation and stop using FAR." OFF. OF CHILD. AND FAM. SERVS., *Family Assessment Response*, https://ocfs.ny.gov/programs/cps/assessment-response.php (last visited Feb. 17, 2024). Thus, that ACS never opened a standard investigation into the Hackett Family demonstrates that the FAR investigation did not reveal safety concerns, akin to an unfounded standard investigation.

to enter and search the home or that they could limit or revoke their consent.

161.    ACS's use of these Coercive Tactics led Ms. Azar and Mr. Eng to reasonably believe they had no choice but to allow ACS to enter and search their home.

162.    During the home searches ACS executed pursuant to these Coercive Tactics, ACS searched every room of the Azar-Eng Family's home and rifled through the family's refrigerator, kitchen cabinets, and closets.

163.    ACS also strip-searched Y.A. without a court order authorizing the search and without any signs of physical abuse. Y.A. was five years old at the time of this search.

164.    ACS conducted each search of the Azar-Eng Family's home without a court order, without voluntary consent, and without exigent circumstances.

165.    ACS conducted this invasive investigation in response to an allegation of neglect.

166.    On or around July 26, 2022, ACS closed the investigation. Their daughter was never removed, no court case was ever filed, and the investigation was ultimately unfounded.

167.    ACS's invasive and unconstitutional searches of the Azar-Eng's home caused Ms. Azar, Mr. Eng, and Y.A. to suffer severe trauma that remains with them today.

**F.    The Doe 1 Family**

168.    Between May 2021 and August 2022, ACS used the Coercive Tactics to conduct at least two warrantless, non-exigent searches of Jane Doe 1's home.

169.    ACS used the Coercive Tactics to gain entry into the Doe 1 Family home and conduct the warrantless, non-exigent searches, including: (1) threatening Ms. Doe 1 with the use of law enforcement if she did not allow ACS into her home; (2) implying that the searches were required by law; and (3) failing to inform or advise Ms. Doe 1 that she had the right not to permit ACS to enter and search the home or that she could limit or revoke her consent.

170.    ACS's use of these Coercive Tactics led Ms. Doe 1 to reasonably believe she had

no choice but to allow ACS to enter and search her home.

171.    During the home searches ACS executed pursuant to these Coercive Tactics, ACS searched every room of Ms. Doe 1's home and rifled through her cabinets and refrigerator.

172.    ACS also strip-searched A.D.1 multiple times without a court order authorizing the searches and without any allegations or signs of physical abuse. A.D.1 was between five and six years old at the time of these searches.

173.    ACS conducted each search of Ms. Doe 1's home without a court order, without voluntary consent, and without exigent circumstances.

174.    ACS conducted the invasive investigations in response to allegations of neglect.

175.    In or around August 2022, ACS closed the most recent investigation into Ms. Doe 1. Her child was never removed, no court case was ever filed, and the investigations were ultimately unfounded.

176.    ACS's invasive and unconstitutional searches of Ms. Doe 1's home caused Ms. Doe 1 and A.D.1 to suffer severe trauma that remains with them today.

**G.    The Doe 2 Family**

177.    Plaintiff Jane Doe 2 is currently the subject of an active ACS investigation.

178.    In January 2024, as part of this ongoing investigation, ACS used the Coercive Tactics to conduct a warrantless, non-exigent search of Ms. Doe 2's home, including (1) abusing and misrepresenting its authority by telling Ms. Doe 2 that ACS was going to take away her children before searching her home; and (2) failing to inform or advise Ms. Doe 2 that she had the right not to permit ACS to search the home or that she could limit or revoke her consent.

179.    ACS's use of these Coercive Tactics led Ms. Doe 2 to reasonably believe she had no choice but to allow ACS to search her home.

180.    During the home search ACS conducted pursuant to these Coercive Tactics, ACS searched Ms. Doe 2's children's bedrooms and her kitchen.

181.    ACS conducted this home search without a court order, without voluntary consent, and without exigent circumstances.

182.    Prior to ACS's home search, Ms. Doe 2's husband asked if the family should retain a lawyer. ACS answered, "no."

183.    Prior to conducting this home search, ACS threatened to take Ms. Doe 2's children from her care and illegally seized her children without a court order, without voluntary consent, and without a basis to believe the children were in imminent risk of harm in her care.

184.    After ACS illegally seized Ms. Doe 2's children, it took them to a separate location as part of its investigation. ACS returned Ms. Doe 2's children to her care a few hours later.

185.    Ms. Doe 2 is Spanish-speaking and has limited English proficiency. The ACS caseworkers who came to her home spoke to her in English. They used a telephone translator for some but not all of their interaction.

186.    ACS has continued throughout the investigation to communicate with Ms. Doe 2 in English even though they know she has limited English proficiency.

187.    After conducting the home search and illegally seizing and then returning her children, ACS stated that it would return to the home with and without notice.

188.    ACS has not filed a court case against Ms. Doe 2, and her children are living with her and her husband today.

189.    ACS's invasive and unconstitutional search of Ms. Doe 2's home caused Ms. Doe 2 and her family to suffer severe trauma.

## IV.  PLAINTIFFS ARE LIKELY TO BE SUBJECTED TO ACS'S COERCIVE TACTICS AGAIN IN THE FUTURE

190.    All Plaintiffs are likely to be subjected to ACS's Coercive Tactics again in the near future.

191.    Plaintiff Jane Doe 2 is likely to face such Coercive Tactics within the next month.

192.    ACS is likely to conduct additional coerced searches of Plaintiff Jane Doe 2's home within the next month—during its currently active 60-day investigation—because ACS typically conducts several home searches during investigations and ACS stated that it would return to her home after the first coerced home search.

193.    Plaintiffs who do not have active investigations are likewise likely to be subjected to the Coercive Tactics again. Families who are subjected to an ACS investigation once are likely to face more ACS investigations in the near future, often many times over.

194.    Twenty-five percent of children who are subjects of ACS investigations will be subjects of another investigation within one year.[79] In 2022, 50% of reports to the SCR concerned a parent or guardian who had been reported to the SCR at least once in the previous two years.[80]

195.    Plaintiffs have all been subject to at least one ACS investigation.

196.    Plaintiffs are therefore likely to face additional investigations in the near future during which ACS caseworkers will again use the Coercive Tactics to enter and search their homes.

197.    The fact that a family is subjected to repeated ACS investigations does not mean there is a greater likelihood that a child is in danger of neglect or abuse.

---

[79]  N.Y.C. ADMIN. CHILD. SERVS., *Focus on Equity* 223 (2022), https://www.nyc.gov/assets/operations/downloads/pdf/mmr2022/acs.pdf.

[80]  2022 Child Welfare Indicators Annual Report, *supra* note 61, at 10.

198.    For instance, Plaintiffs Gould, Warmington, and Doe 1 were all subject to numerous ACS investigations because abusive ex-partners made false and malicious reports against them.

  a.  Ms. Gould has been subject to twelve unfounded ACS investigations since March 2020 generated by false and malicious reports from her abusive ex-partner.

  b.  Ms. Warmington has been subject to ten unfounded ACS investigations since December 2012 generated by false and malicious reports from her abusive ex-partner.

  c.  Ms. Doe 1 has been subject to six unfounded ACS investigations since April 2019 generated by false and malicious reports from her abusive ex-partner.

199.    ACS did not alter its use of the Coercive Tactics to conduct invasive warrantless home searches of these Plaintiffs even after the agency had a documented track record of false reports against them.

200.    Families in high-poverty neighborhoods are four times more likely than families in low-poverty neighborhoods to be subject to an ACS investigation.[81]

201.    Black and Hispanic families comprise an overwhelmingly disproportionate number of the families that ACS investigates every year in New York City.[82]

---

[81]  Angela Butel, *Data Brief: Child Welfare Investigations & New York City Neighborhoods*, THE NEW SCH. CTR. FOR N.Y.C. AFFS. (2019), http://www.centernyc.org/data-brief-child-welfare-investigations.

[82]  N.Y.C.L.U., *Racism at Every Stage: Data Shows How NYC's Administration for Children's Services Discriminates Against Black and Brown Families* (Dec. 21, 2023), https://www.nyclu.org/en/press-releases/new-report-details-nyc-children-services-agency-discrimination-against-black-and (reporting that Black people comprise 23% of New York City's population but Black parents are the subjects of 38% of initial reports of child maltreatment and that Latinx people comprise 29% of New York City's population but Latinx parents are the subjects of 40% of initial reports of child maltreatment).

202.     In 2022, 81% of families subjected to ACS investigations were Black or Hispanic, even though Black and Hispanic families make up just half of New York City's total population.[83]

203.     New York City neighborhoods with high concentrations of Black and Hispanic residents and high child poverty rates face the highest rates of ACS investigations, while neighborhoods with low concentrations of Black and Hispanic residents and low poverty rates face the lowest rates of ACS investigation.[84]

204.     Black and Hispanic families and families who live in neighborhoods with high child poverty rates are therefore several times more likely than others to be among the more than 50,000 New York City families investigated by ACS each year.

205.     As the City acknowledges, "1 out of every 2 Black children in New York City has been the subject of an investigation by the time they reach the age of 18[.]"[85]

206.     Black families are seven times more likely to be investigated by ACS than white families.[86]

---

[83]  2022 Demographics Report, *supra* note 65, at 1–2; U.S. CENSUS BUREAU, *Quick Facts: New York City*, https://www.census.gov/quickfacts/fact/table/newyorkcitynewyork/POP010220 (last visited Feb. 17, 2024).

[84]  ACS Investigations Summary, *supra* note 31; N.Y.C. PLANNING, *2020 Census Results for New York City* 14–28 (2020), https://www.nyc.gov/assets/planning/download/pdf/planning-level/nyc-population/census2020/dcp_2020-census-briefing-booklet-1.pdf?r=3.

[85]  Press Release, Admin. for Child. Servs., Administration for Children's Services, NYC Public Schools & New York State Office of Children and Family Services Announce Strategies to Address Racial Disproportionality in the Child Welfare System (Oct. 19, 2023), at 2, address-racial-disproportionality.pdf (nyc.gov).

[86]  Andy Newman, *Is N.Y.'s Child Welfare System Racist? Some of Its Own Workers Say Yes*, N.Y. TIMES (Nov. 22, 2022), https://www.nytimes.com/2022/11/22/nyregion/nyc-acs-racism-abuse-neglect.html.

## V.  ACS'S COERCIVE TACTICS HAVE CAUSED AND WILL CONTINUE TO CAUSE FAMILIES ENORMOUS AND LASTING HARM

207.    Plaintiffs' cases exemplify how ACS's widespread use of the Coercive Tactics to enter and search families' homes causes significant and lasting trauma to the tens of thousands of families investigated by ACS each year.

208.    Beyond Plaintiffs' experiences, numerous studies as well as testimony from psychological experts document the harm to parents and children that invasive ACS home entries and searches leave in their wake.

209.    A paper in the peer-reviewed journal *Archives for Pediatric Adolescent Medicine* compared a group of families investigated for child abuse or neglect with a separate group of similarly situated families not subject to any investigation.[87] It concluded that an "investigation predicted higher maternal depressive symptoms" but did not bring about any positive effects on families' social support, general functioning, education, or financial circumstances.[88]

210.    Other psychological and sociological studies have similarly found that parents experience increased depression, "ongoing anxiety," and "powerlessness" during and after intrusive investigations into their family lives,[89] suffering effects like "sleeplessness, weight loss, nausea, night-terrors, and depression."[90] These detrimental effects are even more profound for children.[91]

---

[87]  Kristine A. Campbell *et al.*, *Household, Family, & Child Risk Factors After an Investigation for Suspected Child Maltreatment*, 164 ARCH. PEDIATRIC ADOLESCENT MED. 943–49 (2010).

[88]  *Id.* at 943, 948.

[89]  Kelley Fong, *Getting Eyes in the Home, Child Protective Services Investigations & State Surveillance of Family Life*, 85 AM. SOC. REV. 610, 627 (2020).

[90]  Sabrina Luza & Enrique Ortiz, *The Dynamic of Shame in Interactions Between Child Protective Services & Families Falsely Accused of Child Abuse*, 3 INST. FOR PSYCH. THERAPIES (1991), http://www.ipt-forensics.com/journal/volume3/j3_2_5.htm.

[91]  *See, e.g.*, Joseph Goldstein *et al.*, *The Best Interests of the Child: The Least Detrimental Alternative* 97 (1996) ("The younger the child and the greater her own helplessness and dependence, the stronger is her need to experience her parents as her law-givers—safe, reliable, all-powerful, and independent."). The "invasion of family privacy alters the relationship

211.    Psychological experts have testified that strip-searches of children—like those ACS routinely uses the Coercive Tactics to conduct—can cause children to suffer post-search symptoms including "sleep disturbance, recurrent and intrusive recollections of the event, inability to concentrate, anxiety, depression and development of phobic reactions," and in some instances even to "attempt suicide."[92]

212.    A national research, training, and consultation center that aims to improve child welfare services around the country noted that children experience "surprise, shock, [and] chaos" during investigations, as well as a "loss of control," "powerlessness, helplessness," a "sense of guilt or failure," and fear.[93]

213.    Indeed, according to lawyers who represent children in child welfare proceedings in New York City, "[i]t should be noncontroversial" that child welfare investigations "could cause harm to children[,]" including "significant long-term harm."[94] Other lawyers representing children note that unnecessary and "invasive" ACS investigations can cause "lasting trauma to children and families, particularly in low-income communities of color."[95]

---

between family members" and causes children to "react with anxiety even to temporary infringements of parental autonomy." *Id.*

[92]   Steven F. Shatz, *The Strip Search of Children & the Fourth Amendment*, 26 U.S.F. L. REV. 1, 12 (1991) (quoting psychologists' testimony in federal cases).

[93]   Louise Feld, Victoria Glock-Molloy, & Rachel Stanton, *When Litigants Cry Wolf: False Reports of Child Maltreatment in Custody Litigation & How to Address Them*, 24 N.Y.U. J. LEGIS. & PUB. POL'Y 111, 122 (2021) (quoting CTR. FOR IMPROVEMENT CHILD. & FAM. SERVS., PORTLAND ST. UNIV., SCH. SOC. WORK, *Reducing the Trauma of Investigation, Removal, & Initial Out-Of-Home Placement in Child Abuse Cases: Project Information & Discussion Guide* 12–13 (2009)).

[94]   Melissa Friedman & Daniel Rohr, *Over Reporting and Investigations in the New York City Child Welfare System: A Child's Perspective on Narrowing the Front Door* (section from forthcoming article on file with Plaintiffs' counsel).

[95]   Feld *et al.*, *supra* note 93 at 122.

214.    ACS's widespread use of the Coercive Tactics to enter and search families' homes and strip-search their children inflicts these harms on New York City families on a massive scale.

## CLASS ACTION ALLEGATIONS

215.    Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 under Rule 23(b)(2) of the Federal Rules of Civil Procedure on their own behalf and on behalf of a class of all persons similarly situated.

216.    Plaintiffs seek to represent a certified Plaintiff class consisting of all adult parents or legal guardians subject to ACS investigations in which ACS caseworkers have used, are using, or will use the Coercive Tactics to search their homes without a court order or exigent circumstances (the "Unconstitutional Home Search Class" or "Class").

217.    This action is properly maintainable as a class action because all four requirements of Federal Rule of Civil Procedure 23(a) are satisfied.

218.    Numerosity. The members of the Unconstitutional Home Search Class are too numerous to be joined in one action, and their joinder is impracticable. ACS conducts more than 50,000 investigations each year, nearly all of which include at least one home search. ACS obtains a court order or acts upon exigent circumstances in less than 2% of all its investigations. Although ACS has claimed that it obtains families' consent for home searches during the remaining 98% of its investigations, the extensive public record and experiences of the Plaintiffs described in this Complaint establish that ACS maintains a widespread policy, custom, and practice of using the Coercive Tactics to unconstitutionally search families' homes. Upon information and belief, the Unconstitutional Home Search Class consists of tens of thousands of people.

219.    Commonality. There are numerous questions of law and fact common to the Unconstitutional Home Search Class. These include, without limitation: (1) whether ACS maintains a widespread policy, custom, and practice of using the Coercive Tactics to enter and search families'

homes during ACS investigations; (2) whether ACS's use of the Coercive Tactics violates the Fourth Amendment; (3) whether ACS knows about and is deliberately indifferent to the agency's widespread use of the Coercive Tactics; (4) whether ACS has failed to establish adequate policies or procedures to protect parents' Fourth Amendment rights during the tens of thousands of home searches ACS conducts each year; (5) whether ACS fails to adequately train and supervise caseworkers about parents' Fourth Amendment rights during home searches; (6) whether the City's failure to maintain policies or provide adequate training or supervision regarding parents' Fourth Amendment rights causes ACS's widespread use of the Coercive Tactics; and (7) whether ACS's use of the Coercive Tactics causes harm to class members.

220.   Typicality. The violations and injuries suffered by Plaintiffs are typical of those suffered by members of the Unconstitutional Home Search Class. Like all members of the Class, Plaintiffs are individuals subject to ACS investigations and against whom ACS caseworkers have used, are using, or will use the Coercive Tactics to enter and search their homes without a court order or exigent circumstances.

221.   Adequacy. Plaintiffs and their counsel will adequately and fairly protect the interests of all members of the Class. The interests of the Class representatives are consistent with those of the Class members. In addition, counsel for Plaintiffs are experienced in class action and civil rights litigation and have expertise in the conduct of ACS investigations.

222.   This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(2) because the City has acted on grounds that apply generally to the Class, in that each member of the Class has suffered, is suffering, or is at risk of suffering violations of the same Fourth Amendment right to be free from warrantless intrusions into and searches of their home in the absence of exigent circumstances and without voluntary consent. Accordingly, final injunctive

relief bringing ACS's home search policies and practices into compliance with the Fourth Amendment is appropriate respecting the Class as a whole.

223.    This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

## FIRST CAUSE OF ACTION

42 U.S.C. § 1983 – Fourth Amendment – Unreasonable Search
Unconstitutional Policy, Custom, and/or Practice
(All Plaintiffs, on behalf of themselves and all others similarly situated, against Defendant City
of New York)

224.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs.

225.    At all relevant times, Defendant, acting under color of state law and through ACS and its officials, employees, agents, servants, and/or representatives, has maintained a policy, custom, and/or practice of using the Coercive Tactics during ACS investigations to enter and search families' homes without voluntary consent, without a court order, and in the absence of exigent circumstances.

226.    All acts complained of herein were carried out by ACS officials, employees, agents, servants, and/or representatives, pursuant to the policies, customs, and practices of the City, including ACS.

227.    Defendant's policy, custom, and/or practice of using the Coercive Tactics to conduct warrantless, non-exigent home searches during ACS investigations is so widespread and persistent that it practically has the force of law and is so manifest that it implies the constructive acquiescence of senior policy-making officials.

228.    Defendant's policy, custom, and/or practice of using the Coercive Tactics to

conduct warrantless, non-exigent home searches during ACS investigations has directly and/or proximately caused deprivations of the rights of Named Plaintiffs, as well as the members of the class they seek to represent, under the Fourth Amendment to the U.S. Constitution pursuant to 42 U.S.C § 1983.

229.     As a result of Defendant's conduct, Plaintiffs suffered the injuries hereinbefore alleged.

### SECOND CAUSE OF ACTION

42 U.S.C. § 1983 – Fourth Amendment – Unreasonable Search
Unconstitutional Failure to Train or Supervise
(All Plaintiffs on behalf of themselves and all others similarly situated, against Defendant City of New York)

230.     Plaintiffs reallege and incorporate by reference the foregoing paragraphs.

231.     At all relevant times, Defendant, acting under color of state law and through ACS and its officials, employees, agents, servants, and/or representatives, has acted with deliberate indifference to Plaintiffs' and class members' constitutional rights because Defendant (a) knows to a moral certainty that ACS caseworkers will enter and search families' homes during the tens of thousands of investigations the agency conducts each year; (b) knows ACS caseworkers have a long and well-documented practice of using the Coercive Tactics to conduct warrantless, non-exigent home searches during ACS investigations; and (c) knows ACS caseworkers' use of the Coercive Tactics deprives parents of their Fourth Amendment rights.

232.     Defendant fails to provide adequate training and supervision to ACS caseworkers regarding parents' Fourth Amendment rights during home searches or proper practices to obtain voluntary consent to enter and search families' homes despite knowing that ACS caseworkers will conduct home searches during tens of thousands of investigations the agency conducts each year.

233.     The need for Defendant to provide more or better supervision regarding compliance

with parents' Fourth Amendment rights during ACS investigations is obvious, but Defendant has made no meaningful attempt to prevent or forestall ACS caseworkers' use of the Coercive Tactics.

234. Defendant's failure to adequately train or supervise ACS caseworkers regarding the protection of parents' Fourth Amendment rights has directly and/or proximately caused ACS caseworkers to use the Coercive Tactics to conduct warrantless, non-exigent searches of Plaintiffs' and class members' homes, depriving Plaintiffs and other class members of their rights under the Fourth Amendment to the U.S. Constitution pursuant to 42 U.S.C. § 1983.

235. As a result of Defendant's conduct, Plaintiffs suffered the injuries hereinbefore alleged.

## PRAYER FOR RELIEF

236. WHEREFORE, Plaintiffs respectfully request this Court:

a. Certify this action as a class action on behalf of the proposed class pursuant to Rule 23(b)(2) and Rule 23(b)(1)(A) of the Federal Rules of Civil Procedure;

b. Declare that Defendant's acts, practices, polices, and/or omissions deprive Plaintiffs and Class members of their rights under the Fourth Amendment to the U.S. Constitution;

c. Provide appropriate equitable and injunctive relief to remedy Defendant's unconstitutional policy, custom, and/or practice of using the Coercive Tactics to violate parents' Fourth Amendment rights during ACS investigations;

d. Award compensatory damages to Named Plaintiffs in amounts that are fair, just, and reasonable, to be determined at trial;

e. Award Plaintiffs, including members of the Class, reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

f. Grant such other and further relief as this Court may deem just and proper.

Dated:  New York, New York
February 20, 2024

FAMILY JUSTICE LAW CENTER OF THE
URBAN JUSTICE CENTER

*/s/ David Shalleck-Klein*_____
David Shalleck-Klein
(dshalleckklein@urbanjustice.org)
Eliza J. McDuffie (emcduffie@urbanjustice.org)
40 Rector Street, 9th Floor
New York, New York 10006
Telephone: (646) 602-5600

Anna Arons (aronsa@stjohns.edu), Of Counsel,
*pro hac vice forthcoming*

EMERY CELLI BRINCKERHOFF ABADY
WARD & MAAZEL LLP

Katherine Rosenfeld (krosenfeld@ecbawm.com)
Max Selver (mselver@ecbawm.com)
600 Fifth Avenue, 10th Floor
New York, New York 10020
Telephone: (212) 763-5000

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

Audra J. Soloway (asoloway@paulweiss.com)
Erin J. Morgan (ejmorgan@paulweiss.com)
Daniel A. Negless (dnegless@paulweiss.com)
Sera Idoko (sidoko@paulweiss.com), *pro hac
vice forthcoming*
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000

NYU SCHOOL OF LAW FAMILY DEFENSE
CLINIC / WASHINGTON SQUARE LEGAL
SERVICES, INC.

Christine Gottlieb
(gottlieb@mercury.law.nyu.edu), *pro hac vice
forthcoming*
245 Sullivan Street, 5th Floor
New York, New York 10012
Telephone: (212) 998-6693

*Attorneys for Plaintiffs*